NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CROSSCOUNTRY MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN NEIGHBORHOOD MORTGAGE ACCEPTANCE COMPANY, LLC, <br><br> Defendant. | Civil Action No. 22-1119 (SDW) (LDW) <br><br> **OPINION** <br><br> February 22, 2023 |

**WIGENTON**, District Judge.

Before this Court is Defendant American Neighborhood Mortgage Acceptance Company, LLC's ("Defendant" or "AnnieMac") Motion to Dismiss (D.E. 15) Plaintiff CrossCountry Mortgage, Inc.'s ("Plaintiff" or "CrossCountry") Amended Complaint (D.E. 12, "Amended Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendant's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

I. **FACTUAL HISTORY**

A. **The Former Employees and the Employment Agreements**

CrossCountry and AnnieMac are competitors in the home mortgage lending market. (D.E. 12 ¶ 2.) In December 2019, CrossCountry hired Nathan Matheny and James Stecker ("Former

1

Employees") as outside sales loan originators. (*Id.* ¶¶ 15–16.) In their respective roles, the Former Employees sold mortgage loan packages, and in doing so, they often interacted with actual and prospective clients seeking home mortgage loans from CrossCountry. (*Id.* ¶¶ 15–17.) To process and eventually close the mortgage loans sought by prospective borrowers, the Former Employers routinely obtained non-public personal information. (*Id.* ¶ 18.) CrossCountry required such information to be stored on Encompass, a database maintained by CrossCountry to protect confidential, non-public information collected from borrowers and accessible only by CrossCountry employees who had a business reason to do so. (*Id.* ¶ 19.)

Relatedly, CrossCountry required each of the Former Employees to enter into materially identical employment agreements (D.E. 12-2 at 1–30, "Employment Agreements"), which governed, *inter alia*, the scope of confidential information at CrossCountry and the limitations on the use and disclosure thereof,[1] (*id.* at 6; D.E. 12 ¶¶ 4, 20). The Employment Agreements explain that Confidential Material[2]—including "non-public personal information . . . provided to [Cross Country] by any actual or potential customer"—is "the exclusive and confidential property of [CrossCountry] which shall at all times be regarded, treated and protected as such," and "that all such Confidential Material is in the nature of a trade secret." (D.E. 12 ¶ 21–22; D.E. 12-2 at 6.) Accordingly, the Employment Agreements state that the Former Employees are prohibited from

---

[1] Because the Employment Agreements are materially identical, for consistency and brevity, this Opinion will cite to only one of the Employment Agreements. (D.E. 12-2 at 2–15.)

[2] Article IV, Section 4.1(a) of the Employment Agreement defines "Confidential Material" as:

> [I]nformation, which is available to or used in the business of Employee and (i) is proprietary to, about or created by [CrossCountry], (ii) gives [CrossCountry] a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of [CrossCountry], or (iii) is designated as Confidential Material by [CrossCountry], is known by Employee to be considered confidential by [CrossCountry], or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to [CrossCountry].

(D.E. 12-2 at 6.)

2

disclosing Confidential Information "other than as necessary in carrying out" the employees' duties for CrossCountry, "without first obtaining [CrossCountry]'s prior written consent." (D.E. 12 ¶ 22; D.E. 12-2 at 6–7.) Similarly, "during the term of th[e Employment] Agreement[s] and thereafter," the Former Employees could "not use, copy or transfer Confidential Material other than as necessary in carrying out the business of [CrossCountry], without first obtaining [CrossCountry]'s prior written consent." (D.E. 12 ¶ 23; D.E. 12-2 at 7.)

The Employment Agreements also contain a non-solicitation covenant, which purported to forbid the Former Employees from "contact[ing], call[ing] on or otherwise solicit[ing] or communicat[ing] with in any way any of [CrossCountry]'s past, present or future customers, prospective customers and referral sources with the intention or effect of encouraging [them] . . . to place any portion of such business elsewhere or otherwise interfere with [CrossCountry]'s business." (D.E. 12 ¶ 25; D.E. 12-2 at 8–9.) Further, the Employment Agreements purportedly require the Former Employees to "fully disclose the terms of this [Employment] Agreement to any entity or person prior to entering into any business relationship of any kind whatsoever with such entity or person." (D.E. 12 ¶ 28; D.E. 12-2 at 11.) The Employment Agreements state that the provisions related to confidential information and non-solicitation "shall survive termination or resignation of [the Former Employees'] employment with [CrossCountry]." (D.E. 12 ¶ 27; D.E. 12-2 at 10.)

### B. AnnieMac Hires the Former Employees

In April 2021, Matheny resigned from CrossCountry. (D.E. 12 ¶ 33.) "[A]lmost immediately" thereafter, Matheny began working as a loan officer at AnnieMac.[3] (*Id.*) Before resigning from CrossCountry but after he had already accepted the job with AnnieMac, Matheny

---

[3] AnnieMac promoted Matheny to Branch Manager after one month on the job. (*Id.*)

allegedly stole confidential, non-public information from CrossCountry. (*Id.*) Specifically, Matheny printed information from Encompass—including borrowers' names, contact information, addresses of potential purchase property, social security numbers, and credits scores—for several customers who had started a loan file with CrossCountry, and sent to his personal email other confidential documents—including tax returns, W-2 forms, and payroll documents—for borrowers who had started a loan file with CrossCountry. (*Id.* ¶¶ 34–35.)

In similar fashion, Stecker resigned from CrossCountry in May 2021 and immediately joined AnnieMac. (*Id.* ¶ 51.) Before he left CrossCountry, Stecker—like Matheny—allegedly sent to his personal email account proprietary information maintained by CrossCountry, including pricing information. (*Id.* ¶ 52.)

CrossCountry asserts that AnnieMac then induced and encouraged the Former Employees to use CrossCountry's confidential information to divert borrowers and prospective borrowers from CrossCountry to AnnieMac. (*Id.* ¶¶ 6, 44–45, 57.) For instance, CrossCountry claims that AnnieMac's "Transition Team admitted" on social media to helping Matheny "transfer[] his business to AnnieMac," (*Id.* ¶¶ 7, 31, 36, 42–43), and that AnnieMac induced Matheny to input into Opportunity Watch and MIQ the confidential and proprietary information that they had stolen before resigning from CrossCountry,[4] (*id.* ¶¶ 44–45). As a result, CrossCountry contends, AnnieMac diverted at least eight mortgage loans on borrowers who had already started a loan file

---

[4] According to the Amended Complaint, AnnieMac employs a so-called "Transition Team" to assist potential loan officer recruits to "get in the game quickly" by helping to "transfer[ the loan officer's] business to AnnieMac." (*Id.* ¶ 31.) In addition, AnnieMac advertises to incoming loan officers a tool called "Opportunity Watch," which "helps [loan officers] reconnect with clients precisely when they are most likely to refinance or borrow again." (*Id.* ¶ 32.) Opportunity Watch purportedly functions as a program that tracks "credit score improvements, debt increases, . . . and other situations where the customer may benefit" to determine "logical reasons to reach out, reconnect and set [the customers] up with a loan for the first (or second or third) time." (*Id.*) In other words, when populated with customer information, Opportunity Watch follows "life-altering events" so that AnnieMac's loan officers can "strik[e] while the iron is hot"—*i.e.*, contact prospective customers when they most likely need loans. (*Id.*) The Amended Complaint further alleges that AnnieMac uses another program, MIQ, to store information related to "customers and referral sources." (*Id.* ¶ 45.)

with CrossCountry and whose loans were initially processed by Matheny while he was employed at CrossCountry.  (*Id.* ¶¶ 7, 37, 49.)  CrossCountry maintains that the eight diverted loans "enriched [AnnieMac] to the tune of at least one-hundred thousand dollars."  (*Id.* ¶¶ 7, 49.)   CrossCountry further avers that AnnieMac similarly induced and encouraged Stecker to steal and use CrossCountry's proprietary information to divert borrowers from CrossCountry to AnnieMac.  (*Id.* ¶¶ 51–57, 68–73.)

## II.  PROCEDURAL HISTORY[5]

On March 1, 2022, CrossCountry filed its original complaint against AnnieMac.  (D.E. 1, "Complaint.")  On May 26, 2022, AnnieMac moved to dismiss the Complaint pursuant to Rule 12(b)(6).  (D.E. 9.)  On June 16, 2022, CrossCountry filed a five-count Amended Complaint alleging: tortious interference with Matheny's employment contract (Count One); tortious interference with Stecker's employment contract (Count Two); tortious interference with customer relationships (Count Three); violation of the Defend Trade Secrets Act ("DTSA") (Count Four); and civil conspiracy (Count Five).  (D.E. 12.)  AnnieMac now moves pursuant to Rule 12(b)(6) to dismiss the Amended Complaint.  (D.E. 15.)

## III.  LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level[.]"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cnty.*

---

[5] In addition to the present action, the parties are engaged in another lawsuit before this Court:  *American Neighborhood Mortgage Acceptance Company, LLC v. CrossCountry Mortgage, Inc.*, No. 20-874 (SDW) (LDW). (D.E. 12 ¶¶ 30–31.)

*of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 209–11 (3d Cir. 2009) (discussing the *Iqbal* standard). Still, courts "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] . . . that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## IV. DISCUSSION

### A. Tortious Interference with Contractual Relations (Counts One & Two)

Under New Jersey law,[6] to state a claim for tortious interference with a contractual relationship, a plaintiff must allege (1) a protectable right, *i.e.*, a contract; (2) intentional and

---

[6] Since CrossCountry brings several state law claims, "at the outset th[is] Court must determine which [states'] law[s] to apply." *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011). "[I]t can be inappropriate or impossible for a court to conduct that [choice-of-law] analysis at the motion to dismiss stage when little or no discovery has taken place." *Id.* at 718 (quoting *In re Samsung DLP Television Class Action Litig.*, No. 07-2141,

6

malicious interference with the contract; (3) breach of the contract; and (4) damages. *loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 235 (D.N.J. 2019); *Printing Mart-Morristown v. Sharp Elecs. Corp.,* 563 A.2d 31, 37 (N.J. 1989). Notably, "[f]or a defendant to have specific intent to harm a contractual relationship, it must first have knowledge of that relationship." *Acclaim Sys., Inc. v. Infosys, Ltd.*, 679 F. App'x 207, 211 (3d Cir. 2017). "And without knowledge of the specific contractual right, [the defendant] cannot be deemed to have intentionally interfered with that right." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013).

1. Count I (Matheny)

CrossCountry has adequately stated a claim for tortious interference with Matheny's Employment Contract. As the Amended Complaint alleges: Matheny was subject to the Employment Agreement, (D.E. 12 ¶ 20); he was required to "fully disclose" the Employment Agreement to AnnieMac, (*id.* ¶ 28); AnnieMac agreed to hire Matheny before he left CrossCountry, (*id.* ¶¶ 33–34); after he had accepted a job with AnnieMac but before resigning from CrossCountry, Matheny stole confidential, non-public information from CrossCountry, (*id.* ¶ 34); immediately after his resignation from CrossCountry, Matheny began working at AnnieMac, (*id.* ¶¶ 33, 38, 45); AnnieMac provided a Transition Team to help Matheny to transfer his business

---

2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009)). In its briefing, AnnieMac cursorily contends that New Jersey law should apply to the state law claims in the instant suit. CrossCountry has not disputed that issue and indeed only considers New Jersey law in its briefing. Accordingly, this Court declines to engage in such a fact-intensive inquiry at this stage, because full discovery has not occurred, the choice-of-law issue has not been fully briefed, and the "parties have briefed the sufficiency of the claims under New Jersey law." *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 591 n.5 (D.N.J. 2016) ("Since Plaintiffs have made their allegations under New Jersey law and both parties have briefed the sufficiency of the claims under New Jersey law, the Court will, for purposes of deciding the present motion to dismiss, apply New Jersey law to determine whether Plaintiffs have succeeded in stating plausible claims for relief. . . ."); *Pet Gifts USA, LLC, v. Imagine This Co.*, No. 14-3884, 2015 WL 570264, at *3 (D.N.J. Feb. 11, 2015) ("[W]here the analysis is fact intensive and a court finds that it lacks a full factual record to make a choice of law determination, a court may postpone the analysis."). Therefore, for purposes of resolving the present motion, this Court will assume that New Jersey law governs CrossCountry's state law claims.

from CrossCountry to AnnieMac, and offered software programs to Matheny to solicit CrossCountry customers and referral sources, (*Id.* ¶¶ 31–32, 41–45); (7) Matheny's alleged theft and subsequent use of CrossCountry's non-public, confidential information constituted a breach of the Employment Agreement, (*id.* ¶¶ 63–64); and (8) the eight diverted mortgage loans—which were all initially processed by Matheny—resulted in over one-hundred thousand dollars in damages, (*id.* ¶¶ 7, 37, 49). These allegations and the inferences drawn therefrom, plausibly suggest and sufficiently plead that AnnieMac tortiously interfered with Matheny's Employment Agreement.

AnnieMac contends that the Amended Complaint fails to specifically allege both AnnieMac's knowledge of Matheny's Employment Agreement and AnnieMac's malicious acts to interfere therewith. (D.E. 15-1 at 16–18; D.E. 17 at 7–11.) Those arguments, however, are premature and misconstrue the pleading standard.[7] As the Third Circuit has explained, "although *Twombly* and *Iqbal* emphasized the plaintiff's burden of pleading sufficient 'factual matter,' the Supreme Court also expressly 'disavow[ed]' the requirement that a plaintiff plead 'specific facts.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). Indeed, this Court "cannot inject evidentiary issues into the plausibility determination" by weighing facts or "requir[ing] that a plaintiff plead 'specific facts' beyond those necessary to state a valid claim." *Id.* at 347–48 (quoting *Twombly*, 550 U.S. at 573). Furthermore, although "[a]ctual knowledge of the contract

---

[7] AnnieMac raises its lack-of-specificity argument several times throughout its briefing. First, this argument is generally premature and more appropriately raised on summary judgment. At this stage, this Court's directive is clear—it must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (quoting *Pinker*, 292 F.3d at 374 n.7). Second, although the Amended Complaint is littered with conclusory and unspecific allegations, the specific allegations contained therein "'plausibly suggest[]' facts sufficient to 'draw the reasonable inference[s] that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Twombly*, 550 U.S. at 557 and *Iqbal*, 556 U.S. at 678).

with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference," *Acclaim Sys., Inc.*, 679 F. App'x at 211 (quoting *Mylan Inc.*, 723 F.3d at 422), to survive a motion to dismiss, a complaint need only contain factual allegations sufficient to suggest that the defendant "knew or should have known of the contract." *Bellator Sport Worldwide, LLC v. Zuffa, LLC*, No. 10-4091, 2011 WL 6303359, at *1 (D.N.J. Dec. 16, 2011); *cf. Sunbelt Rentals, Inc. v. EquipmentShare.com Inc.*, No. 21-6511, 2021 WL 4311517, at *1 (D.N.J. Sept. 22, 2021) (holding that it is "perfectly appropriate for Plaintiff to plead 'upon information and belief'" that the defendant "had prior knowledge of the contracts").

Here, the non-conclusory allegations in the Amended Complaint and the reasonable inferences drawn therefrom plausibly suggest that AnnieMac knew or should have known of Matheny's Employment Agreement and intentionally interfered therewith. As an initial matter, the Amended Complaint asserts that Matheny was required to fully disclose the Employment Agreement to AnnieMac, and it is therefore plausible that Matheny did so. (D.E. 12 ¶ 28.) Moreover, the close temporal proximity between Matheny's job offer with AnnieMac, his purported theft and resignation from CrossCountry, and his immediate transition to AnnieMac plausibly suggest intentional and malicious interference.

Next, AnnieMac maintains that CrossCountry's claims are impermissibly based on overbroad and unenforceable restrictive covenants. (D.E. 15-1 at 23–28.) That argument is similarly premature. The Third Circuit has explained that determining "[w]hether a covenant not to compete is unreasonable is a holistic inquiry," that "requires balancing the employer's need to protect its investment and disclosures against the employee's need to earn a living in his chosen field and the public interest, and then determining whether the covenant comes reasonably close to that balance." *Victaulic Co. v. Tieman*, 499 F.3d 227, 238 (3d Cir. 2007) (citation omitted). "At

the pleadings stage, a court rarely knows enough about the substance of this balancing act to make a judgment as to whether the covenant is reasonable." *Id.* Accordingly, this Court will not delve into the validity of the non-solicitation provision contained in Matheny's Employment Agreement.

Therefore, AnnieMac's motion to dismiss Count I of the Amended Complaint is denied.[8]

2. Count II (Stecker)

While the Amended Complaint pleads facts to plausibly state a claim that AnnieMac interfered with Matheny's Employment Agreement, the same cannot be said of CrossCountry's claim for tortious interference with Stecker's Employment Agreement. The Amended Complaint does not allege any facts from which reasonable inferences can be drawn to suggest that AnnieMac encouraged and induced Stecker to breach his Employment Agreement; rather, it contains mere conclusory allegations of AnnieMac's purported interference. (D.E. 12 ¶¶ 51–57, 68–73.) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to state a claim. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Accordingly, AnnieMac's motion to dismiss Count II is granted.

**B. Tortious Interference with CrossCountry's Customer Relationships (Count Three)**

AnnieMac contends that Count III must be dismissed because the Amended Complaint fails to specifically allege intentional and malicious interference or a reasonable expectation of future business. (D.E. 15-1 at 28–32; D.E. 17 at 12–15.) Those arguments miss the mark. To state a claim for tortious interference with customer relationships, a plaintiff "must allege (1) a

---

[8] AnnieMac also offers an innocent explanation for the services it offered to Matheny. Specifically, AnnieMac argues that the Transition Team, Opportunity Watch, and MIQ are lawful training, onboarding, and business development tools. (D.E. 15-1 at 18–23; D.E. 17 at 9–10.) That may be so, however, at the pleadings stage, this Court's inquiry focuses on the plausibility—rather than the probability—of the *plaintiff's* allegations. *See Doe*, 30 F.4th at 344 ("[T]he plausibility standard is not akin to a probability requirement."). Although the allegations stated in the Amended Complaint may "not [be] the only plausible explanation[s]" for AnnieMac's alleged misconduct, "or even the most plausible[,] . . . alternative explanations are not fatal to [CrossCountry]'s ability to survive a Rule 12(b)(6) motion to dismiss." *Id.* (quoting *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018))**.**

protectable right—*i.e.*, a prospective economic or contractual relationship or reasonable expectation thereof; (2) interference done intentionally and with malice; (3) interference caused the loss of the prospective gain; and (4) resulting damages." *Am. Neighborhood Mortg. Acceptance Co. v. CrossCountry Mortg., Inc.*, No. 20-874, 2022 WL 1423090, at *5 (D.N.J. May 4, 2022) (citing *Printing Mart-Morristown*, 563 A.2d at 37). As this Court has previously noted, "the elements of tortious interference with a contractual relationship claim and tortious interference with prospective economic relations claims are nearly identical." *Id.* Indeed, "[t]he only distinction between the claims is that a tortious interference with a contractual relationship claim must allege a contract, while a tortious interference with a prospective economic benefit or economic relations must allege a prospective economic advantage as the protectable right." *Id.* (citing *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996)).

Because this Opinion has already addressed the overlapping elements of Counts I, II, and III, this Court need only determine whether CrossCountry has sufficiently alleged a prospective economic advantage or a reasonable expectation thereof. CrossCountry has done so by asserting that: (1) AnnieMac diverted and closed at least eight mortgage loans for borrowers who had already started a loan file with CrossCountry; (2) those eight mortgage loans were initially processed by Matheny while he worked for CrossCountry; and (3) some of the borrowers diverted to AnnieMac had previously closed mortgage loans with CrossCountry. (D.E. 12 ¶¶ 37–38.)

AnnieMac argues that CrossCountry has failed to adequately plead a reasonable expectation of future business. (D.E. 15-1 at 30; D.E. 17 at 12–13.) According to AnnieMac, "[t]he mere fact that a customer had previously done business with CrossCountry, even if true, does not suffice to establish that CrossCountry had a 'reasonable expectation' of future economic benefit." (D.E. 15-1 at 31.) AnnieMac misinterprets the plausibility standard and the allegations

11

in the Amended Complaint. On a motion to dismiss, "the inquiry is whether Plaintiff has alleged that but for Defendant's interference, there was a *reasonable* probability of economic advantage." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. 10-453, 2010 WL 5239238, at *8 (D.N.J. Dec. 16, 2010). CrossCountry need not allege the precise probability that the eight loans at issue would have closed with CrossCountry; rather, all it must assert is that there was a *reasonable* probability. *Id.* Here, CrossCountry does more than merely allege that previous business is indicative of a reasonable expectation of future economic benefit. Instead, CrossCountry asserts that some of the diverted borrowers had previously closed mortgage loans with CrossCountry *and had come back to CrossCountry to do more business* by starting new loan files with Stecker. (D.E. 12 ¶¶ 37–38.) Such allegations suggest a reasonable expectation of future economic benefit. Consequently, AnnieMac's motion to dismiss Count III of the Amended Complaint is denied.

**C. Violation of Trade Secrets under the DTSA (Count Four)**

AnnieMac argues that Count IV must be dismissed because the Amended Complaint specifies neither a trade secret nor any improper means by which AnnieMac misappropriated the alleged trade secret. (D.E. 15-1 at 32–34; D.E. 17 at 15–17.) To state a claim under the DTSA, a plaintiff must allege "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019). This Court will analyze each element in turn.

1. Trade Secret

To adequately plead the existence of a trade secret, a plaintiff must "sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). Courts will "consider whether the owner of the information 'has taken reasonable measure to keep . . . [it] secret' and whether the 'information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by," others who could financially benefit from the information. *Id.* (alterations in original) (quoting 18 U.S.C. § 1839(3)). Although a plaintiff's complaint must be specific enough "to place a defendant on notice of the bases for the claim being made against it, . . . a plaintiff need not 'spell out the details of the trade secret to avoid' dismissal." *Id.* (citations omitted).

Here, the Amended Complaint sets forth that Matheny printed, sent to his personal email, and otherwise stole from CrossCountry confidential, non-public information—names, contact information, social security numbers, credit scores, payroll documents, tax returns and other tax-related documents.[9] (D.E. 12 ¶¶ 33–35.) That stolen information belonged to customers A.A., W.H., B.M., M.K., P.K., and P.M. (*Id.* ¶¶ 34–35.) CrossCountry alleges that such information derives economic value because it can be used to track and target current and prospective borrowers for purposes of closing mortgage loans. (*Id.* ¶¶ 42–45.) Indeed, the Employment Agreement specifically designates such non-public information as "Confidential Material," and expressly states "that all such Confidential Material is in the nature of a trade secret." (*Id.* ¶¶ 21–22.) Moreover, CrossCountry maintains that it protected that information as a trade secret—

---

[9] AnnieMac contends that the Amended Complaint "fail[s] to state with adequate specificity what 'customer information' or 'pricing information' was purportedly stolen." (D.E. 15-1 at 33.) AnnieMac's argument seemingly ignores the plain allegations in the Amended Complaint, which clearly enumerate the types of information that had allegedly been stolen.

CrossCountry stored it on Encompass and limited access thereto. (*Id.* ¶ 19.) CrossCountry has therefore plausibly alleged that it had trade secrets.

    2. <u>Misappropriation</u>

To adequately plead misappropriation, a plaintiff must allege that the defendant improperly acquired, disclosed, or used a trade secret without consent. *Oakwood Labs. LLC*, 999 F.3d at 907–08. Here, CrossCountry contends that AnnieMac both improperly acquired and used CrossCountry's trade secrets.

The DTSA defines improper acquisition as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). "The DTSA does not define the term 'use.'" *Oakwood Labs. LLC*, 999 F.3d at 908. The Third Circuit has explained that the term "use" should be given an "expansive interpretation"—that is, "'use' of a trade secret encompasses all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or acceleratin[ing] research or development.'" *Id.* at 910 (quoting *Gen. Universal Sys., Inc.*, 500 F.3 at 450–51).

CrossCountry has adequately alleged improper acquisition and use. As explained earlier in this Opinion, the Amended Complaint plausibly alleges that AnnieMac acquired CrossCountry's trade secrets with knowledge or reason to know that Matheny breached his Employment Agreement, and that AnnieMac used the stolen trade secrets to divert customers from CrossCountry. Consequently, AnnieMac's motion to dismiss Count IV is denied.

    **D. Civil Conspiracy (Count Five)**

AnnieMac argues that Count V must be dismissed because the Amended Complaint alleges neither a specific agreement between AnnieMac and the Former Employees, nor overt acts by AnnieMac in furtherance of the conspiracy.  (D.E. 15-1 at 35–36; D.E. 17 at 17–18.)  CrossCountry has adequately pleaded a civil conspiracy between AnnieMac and Matheny but has not sufficiently alleged a civil conspiracy between AnnieMac and Stecker.

Under New Jersey law, to state a civil-conspiracy claim, a plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, and an overt act that results in damage."  *John Wiley & Sons, Inc. v. Rivadeneyra*, 179 F. Supp. 3d 407, 411–12 (D.N.J. 2016) (quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005)).  "It is enough for liability if [the defendants] understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do their part to further them.  *Id.* at 412 (alteration in original) (quoting *Gandi*, 876 A.2d at 263).  Under Rule 9(b), a plaintiff must plead with specificity claims for civil conspiracy to defraud, *id.* at 411; however, "[w]hen no fraud is involved, the general Rule 8 pleading standard applies to a claim of civil conspiracy," *Hillsborough Rare Coins, LLC v. ADT, LLC*, No. 16-916, 2017 WL 1731695, at *12 (D.N.J. May 2, 2017).  Therefore, at the pleadings stage, a plaintiff need only allege "some facts which could, if proven, permit a reasonable inference of a conspiracy to be drawn."  *Wiatt v. Winston & Strawn*, 838 F. Supp. 2d 296, 317 (D.N.J. 2012) (quoting *Durham v. City & Cnty. of Erie*, 171 F. App'x 412, 415 (3d Cir. 2006)).

CrossCountry has adequately alleged a civil conspiracy between AnnieMac and Matheny.  According to CrossCountry, AnnieMac agreed to hire Matheny while he was still working at CrossCountry, (D.E. 12 ¶ 36); Matheny purportedly stole confidential, non-public information

15

from CrossCountry before he resigned, (*id.* ¶¶ 34–36); Matheny began working at AnnieMac immediately after resigning from CrossCountry, (*id.* ¶ 33); AnnieMac's Transition Team helped Matheny to "transfer[] his business to AnnieMac," (*id.* ¶¶ 42–43); and AnnieMac provided programs—*i.e.*, Opportunity Watch and MIQ—to Matheny, which, in turn, AnnieMac populated with the non-public and confidential information that Matheny allegedly stole from CrossCountry, (*id.* ¶¶ 44–45). At bottom, these allegations and the reasonable inferences drawn therefrom suggest an implicit agreement between AnnieMac and Matheny, and AnnieMac's use of its Transition Team, Opportunity Watch, and MIQ plausibly suggest overt acts in furtherance of the conspiracy. Therefore, CrossCountry's Amended Complaint sufficiently states a claim for civil conspiracy, and AnnieMac's motion to dismiss Count V must be denied.

Count V is dismissed, however, to the extent the claim is based on a civil conspiracy between AnnieMac and Stecker. As explained earlier in this Opinion, this Court dismissed Count II because CrossCountry has alleged only conclusory allegations with respect to Stecker. So too here, CrossCountry's claim of a civil conspiracy between AnnieMac and Stecker—based entirely on conclusory statements—cannot survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)).

V. **CONCLUSION**

For the reasons set forth above, AnnieMac's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
        Leda D. Wettre, U.S.M.J.